1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT TORREY,                                    No. C-04-3225 JCS

        Plaintiff(s),

    v.                                             **ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFF'S
MOTION FOR ENTRY OF DEFAULT**
MICHAEL WESTRICH,                                **JUDGMENT [Docket No. 58]**

        Defendant(s).

_____/

**I.      INTRODUCTION**

      This action, which originally was filed in Contra Costa County Superior Court, arises out of the sale of an art collection to Plaintiff Robert Torrey by Defendant Michael Westrich.  Torrey alleges that Westrich knowingly misrepresented the nature and value of the items in the collection and asserts claims for breach of contract, fraud, negligent misrepresentation and restitution.  Defendant removed the action to federal court and filed an answer to Plaintiff's complaint.  Both parties consented to the jurisdiction of a United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  However, Westrich subsequently failed to respond to various discovery requests and did not appear in response to the Court's Order to Show Cause. Accordingly, the Court instructed the Clerk to enter Westrich's default and Torrey to file a motion for default judgment ("the Motion").

      A hearing on the Motion was held on Friday, May 27, 2005 at 9:30 a.m.  For the reasons stated below, the Motion is GRANTED in part and DENIED in part and the Court awards $1,021,613.91 in damages.

**United States District Court**
For the Northern District of California

1    II.    **BACKGROUND**

2          A.    **Facts**

3          In May 2004, a friend of Torrey's, Jimmy Osburn, told him that he had heard from an

4    acquaintance, Joseph Gutierrez, that a valuable collection of African tribal artifacts, owned by Westrich,

5    was available for sale.  Amended Complaint at 1-2; Declaration of Robert Torrey in Support of Motion for

6    Entry of Default Judgment ("Torrey Decl.") at 1.  Torrey spoke on the phone with Gutierrez, who told

7    Torrey he had been authorized by Westrich to represent to him that "the Art consisted of genuine African

8    tribal artifacts and not made-for-sale commercial items; that [Westrich] personally had known the original

9    collectors of the items and/or their families; that he was intimately familiar with all the pieces, many of which

10   he claimed had been displayed in private and public museums; that all of the items had been collected

11   between 1890 and 1940; and that [Westrich] was willing to sell the collection for $150,000."  Amended

12   Complaint at 2; Torrey Decl. at 1-2.  Gutierrez further represented to Torrey that Westrich had told him the

13   collection could easily be resold for at least $500,000.00.  Torrey Decl. at 1-2.  Subsequently, Westrich

14   brought the collection to California and showed it to Torrey in Osburn's home in Antioch.  Amended

15   Complaint at 2-3; Torrey Decl. at 2.  There, he described the items in the collection in detail and repeated

16   the above representations.  *Id*.  Based on those representations, Torrey purchased the collection for

17   $150,000.00.[1]  Amended Complaint at 3.

18         After purchasing the art collection, Torrey created a website with pictures of the items in the

19   collection for potential buyers.  Torrey Decl. at 3.  Torrey asked the tribal arts expert at the Bonham-

20   Butterfield auction house in San Francisco, Jim Haas, to look at the pictures.  Amended Complaint at 3;

21   Torrey Decl. at 3.  Haas looked at the pictures and informed Torrey that none of the items were authentic

22   African art or original tribal artifacts.  Id.  Rather, the items were "made-for-sale" tourist items that could

23   not have been collected before 1940 as Westrich had represented.  Id.  Haas also told Torrey that the

24   collection had little value.  Amended Complaint at 3; Torrey Decl. at 4.  Torrey called Westrich and told

25

26   _____

27         [1]In his declaration, Torrey states that in fact, he inadvertently paid Westrich $160,000.00 for the
     collection.  Torrey Decl.  at 3.

28                                                    2

1    him about Haas's opinion.  Amended Complaint at 3.  Westrich reiterated his earlier representations

2    concerning the value of the collection.  Id.  Torrey then had the collection

3    appraised by a certified art appraiser, Jeffrey Ghent.  Amended Complaint at 4; Torrey Decl. at 5.  Ghent

4    concluded that the total value of the collection was $19,405.00.  Amended Complaint at 4; Torrey Decl. at

5    8; Declaration of Gregory Ghent in Support of Motion to Entry of Default Judgment ("Ghent Decl.") at 2 &

6    Ex. A (appraisal report).

7         On July 7, 2004 – the same day the state court action was filed – Torrey met with Gutierrez and

8    Westrich at Torrey's airplane hangar in Concord and had them identify again each item in the collection.

9    Torrey Decl. at 9.  Torrey arranged to have two detectives from the Antioch Police Department present.

10    Torrey Decl. at 9.  At the meeting, Westrich described a number of the items differently than he had when

11    he first showed the collection to Torrey but "acted like he had always told [Torrey] the same thing."  Torrey

12    Decl. at 9.  According to Torrey, the newer descriptions were more accurate than the original ones, leading

13    him to conclude that "when Westrich had met with us at Osburn's, he was simply making things up,

14    whereas by the time he came to the hangar, he had done some homework."  *Id.*  Torrey included among

15    the collection an item his daughter had bought at a flea market for under $5.00.  *Id.* at 10.  Westrich

16    identified it as a tribal artifact that had come from the Whitten collection, and valued it at $700.00.  *Id.*

17    After Westrich had identified over 100 items, Torrey confronted him with Ghent appraisal.  *Id.*  Westrich

18    apologized and promised to return Torrey's money as soon as he returned to his home in Tennessee, but

19    said he could not do so that day.  *Id.*  Westrich then was interviewed by the detectives from the Antioch

20    Police Department.  *Id*.  According to Torrey, the detectives told him Westrich had promised he would pay

21    Torrey back and therefore, there was no reason to arrest Westrich.  *Id*.  However, Westrich did not

22    respond to subsequent calls and e-mails from Torrey requesting payment.  *Id.*

23         Later, Torrey learned that Westrich bought the collection in 2004 from The Sands of Time Museum

24    in North Carolina.  *Id.*  According to Torrey, "[t]he Sands of Time is not really a museum, but rather part

25    of a roadside tourist site called Gem Mountain."  *Id.*  The owner of Sands of Time told Torrey that he sold

26    the collection to Westrich for around $8,600.00.  *Id*.  Torrey also states that Gutierrez told him that

27

28                                      3

**United States District Court**
For the Northern District of California

Westrich paid Gutierrez $10,000.00 to help him sell the collection, that Gutierrez knew at the time they were made that Westrich's representations were "bogus," and that Westrich and Gutierrez arranged the scheme to sell the collection to Torrey in advance. *Id.* at 11.   Gutierrez failed to appear at a scheduled deposition and has not been deposed in this case.   Id.

> **B.      Procedural Background**

Torrey filed this action on July 7, 2004 in Contra Costa County Superior Court.  Westrich removed to this Court on August 9, 2004, on the basis of diversity jurisdiction.  On September 14, 2004, Torrey filed an amended complaint asserting claims for breach of contract, fraud, negligent misrepresentation and restitution.  Torrey sought: 1) compensatory and consequential damages, including prejudgment interest; 2)  punitive damages; 3) restitution; and 4)  attorneys' fees and costs.  Westrich filed an answer to the amended complaint on October 1, 2004.  On November 5, 2004, the Court granted a motion to withdraw by Westrich's counsel.

On November 23, 2004, Torrey's counsel served on Westrich a First Set of Special Interrogatories, a First Request for Production of Documents, and a notice of Westrich's deposition, scheduled to take place December 9, 2004 – the day before a scheduled case management conference. Declaration of Joan Presky in Support of Motion for Entry of Default Judgment ("Presky Decl.") at 2. Westrich did not object to the deposition notice or attempt to reschedule and did not appear at the deposition. *Id.*  He also did not respond to Torrey's interrogatories or produce any documents and did not show up at the December 10, 2004 case management conference. Id.  The Court continued the case management conference to January 28, 2005 and issued an Order to Show Cause why default judgment should not be entered. *Id.*  Westrich sent a letter to the Court dated January 13, 2005 stating that he did not intend to appear until he found new counsel, and Westrich did not, in fact, appear at the January 28, 2005 hearing.  The Court continued the case management conference and the hearing on the Order to Show Cause until March 4, 2005, ordering Westrich to appear personally and warning that failure to appear would result in entry of default against him.  Westrich did not appear at the March 4, 2005 hearing and the Court ordered the Clerk to enter Westrich's default.

United States District Court
For the Northern District of California

In the Motion, Torrey seeks entry of default judgment and an award of damages in the following amounts: 1) $507,865.00 in compensatory and consequential damages; 2) $507,865.00 in punitive damages; 3) $39,796.66 in prejudgment interest; and 4) $1,196.00 in costs.  Torrey seeks total damages in the amount of $1,056,559.10.

## III.    ANALYSIS

### A.    <u>Standard For Awarding Default Judgment</u>

Under Federal Rule of Civil Procedure 55(b)(2), the court may enter a default judgment where the clerk, under Rule 55(a), has already entered the party's default based upon failure to plead or otherwise defend the action.  Further, where a defendant has filed an answer but has failed to comply with discovery obligations, the court may strike the answer and enter default judgment against the defendant.  *See Fair Housing of Marin v. Combs,*  285 F.3d 899, 905 (9th Cir. 2002) (citing Federal Rule of Civil Procedure 37(b)(2)(C)).[2]  Entry of default judgment as a sanction for discovery violations is appropriate only in "extreme circumstances" and where the violations are "due to wilfulness, bad faith, or fault of the party." *Fair Housing of Marin,* 285 F.3d at 905 (citations omitted).  "Disobedient conduct not shown to be outside the litigant's control meets this standard." *Id*. (citations omitted)

The district court's decision to enter a default judgment involves some discretion. *Lau Ah Yew v. Dulles,* 236 F.2d 415 (9th Cir. 1956) (affirming district court's denial of default judgment).  The court is

---

[2]Rule 37(b)(2)provides, in relevant part, as follows:

(b) Failure to Comply With Order.

. . .

(2) Sanctions by Court in Which Action is Pending. If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

. . .

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

5

free to consider a wide range of factors in deciding whether to enter a default judgment, including: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action,  (5) the possibility of a dispute concerning material facts,  (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel v. McCool*, 782 F.2d 1470, 1471-1472 (9th Cir. 1986).

In considering the sufficiency of the complaint and the merits of the plaintiff's substantive claim, facts alleged in the complaint, except those relating to the amount of damages, generally are deemed to be true by virtue of the defendant's default. *Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977).  On the other hand, a defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law. *Nishimatsu Construction Co., Ltd. v. Houston National Bank*, 515 F. 2d. 1200, 1206 (5th Cir. 1975) (holding that allegations concerning existence and terms of a contract did not support liability where allegations were contradicted by actual contract).

**B.     Entry of Default Judgment**

Westrich has repeatedly failed to meet discovery obligations and violated the Court's orders.  He did not respond to Torrey's interrogatories or request for production, did not appear for his own deposition and did not show up for a scheduled case management conference.  In response to the Court's Order to Show Cause, Westrich informed the Court that he needed time to retain new counsel.  Yet when the Court continued the hearing for another month, Westrich again failed to appear – this time with no explanation.  In light of Westrich's repeated and flagrant disregard of this Court's orders, entry of default judgment is an appropriate sanction.

The Court also finds that entry of default judgment is appropriate in light of the concerns articulated in *Eitel*.  In particular, Torrey's claims are well-pleaded and there is substantial evidence in the record that the claims are meritorious.  Conversely, there is no evidence that Westrich's default was due to excusable neglect.  Rather, as discussed above, the Court finds that Westrich's default was wilful and in bad faith.

6

**United States District Court**
For the Northern District of California

**C.      Damages**

      **1.      Compensatory and Consequential Damages and Prejudgment Interest Thereon**

Torrey seeks compensatory and consequential damages in the amount of $507,865.00.   This includes: 1) the $150,000 purchase price of the collection; 2) $350,000 in lost profits; and 3) $7,865.00 for various expenses associated with the purchase of the collection (broker commissions incurred selling bonds to pay for the collection, the cost of developing photographs to be used in reselling the items, the cost of transporting the collection, the cost of the appraisal, storage costs and other miscellaneous costs). Torrey Decl. at 11-12.  Torrey argues that he is entitled to such damages based on either his contract claim or his fraud claim.  The Court awards the amounts listed above less the appraised value of $19,045.00, that is $488,820.00, in compensatory and consequential damages.

      **a.      Contract Damages**

Under California law, the measure of damages for breach of contract is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."  Cal. Civ. Code. § 3300.  The theory underlying this rule is that "the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance."  *Brandon & Tibbs v. George Kevorkian Accountancy Corp*., 226 Cal. App. 3d 442, 456 (1990).  In construing § 3300, California courts follow the rule of *Hadley v. Baxendale,* 156 Eng. Rep. 145 (1854), that damages are recoverable only if they are foreseeable.  *Id*.

Two kinds of contract damages may be awarded: 1) general damages, which "are ordinarily confined to those which would naturally arise from the breach, or which might have been reasonably contemplated or foreseen by both parties, at the time they made the contract, as the probable result of the breach;" and 2) special damages, where special circumstances caused some unusual injury and where those circumstances were known or should have been known to the breaching party at the time he entered into the contract.  *Id*.  Lost profits are considered special damages and may be awarded where they were contemplated by the parties at the time of contracting.  *See Cohn v. Rosenfeld*, 733 F.2d 625, 630 (9th

United States District Court

For the Northern District of California

1    Cir. 1984) (holding that lost profits damages were properly awarded where both parties contemplated a

2    resale of contract goods by the purchaser).

3          Here, the evidence establishes that Torrey incurred $130,955.00 in general damages based on the

4    purchase price of the collection less the appraised value of the collection. In addition, the evidence

5    supports the conclusion that the parties understood at the time of contracting that items in the collection

6    were to be resold, with an expected profit of $350,000.00. Therefore, Torrey is entitled to special

7    damages in that amount for lost profits. Finally, the additional $7,865.00 incurred in purchasing,

8    transporting and photographing the items in the collection to resell was foreseeable. Therefore, Torrey is

9    entitled to $488,820.00 in damages on the contract claim.

10                          **b.       Fraud Damages**

11         In the alternative, Torrey may recover the same damages on his fraud claim under California Civil

12   Code § 3343.[3]  Section 3343 provides, in relevant part, as follows:

13         § 3343. Fraud in purchase, sale or exchange of property; additional damages

14         (a) One defrauded in the purchase, sale or exchange of property is entitled to recover the
           difference between the actual value of that with which the defrauded person parted and the actual
15         value of that which he received, together with any additional damage arising from the particular
           transaction, including any of the following:
16
           (1) Amounts actually and reasonably expended in reliance upon the fraud.
17
           . . .
18
           (4) Where the defrauded party has been induced by reason of the fraud to purchase or otherwise
19         acquire the property in question, an amount which will compensate him for any loss of profits or
           other gains which were reasonably anticipated and would have been earned by him from the use or
20         sale of the property had it possessed the characteristics fraudulently attributed to it by the party
           committing the fraud, provided that lost profits from the use or sale of the property shall be
21         recoverable only if and only to the extent that all of the following apply:

22                   (i) The defrauded party acquired the property for the purpose of using or reselling it for a
                     profit.

23

24

25         [3]Torrey is not, however, entitled to double recovery on these claims. *See Lazar v. Superior Court*
26   *of Los Angeles County*, 12 Cal. 4th 631 (1996) (noting in case involving tort and contract claims that
     ":[r]ecovery . . . may be limited by the rule against double recovery of tort and contract compensatory
27   damages").

(ii) The defrauded party reasonably relied on the fraud in entering into the transaction and in anticipating profits from the subsequent use or sale of the property.

(iii) Any loss of profits for which damages are sought under this paragraph have been proximately caused by the fraud and the defrauded party's reliance on it.

Cal. Civ. Code § 3343; *see also Hartman v. Shell Oil Co.*, 68 Cal. App. 3d 240, 247 (1977) (holding that under § 3343(a)(4), lost profits are recoverable where fraud involved sale of real property). Under § 3343, Torrey is entitled to his purchase price less the value of the collection, that is, $130,955.00, the additional $7,865 he spent in reliance on the fraud to carry out the purchase and attempted resale of the collection (whether or not it was foreseeable), and lost profits in the amount of $350,000.00.

### c.    Prejudgment Interest

In the Motion, Torrey requests $13,356.16 in prejudgment interest on the $150,000.00 purchase price, calculated from the date of payment (May 11, 2004) to April 1, 2005 using the 10% interest specified in Cal. Civ. Code § 3289(b).  *See* Declaration of Joan Presky in Support of Motion for Entry of Default Judgment.  ("Presky Decl.") at 3.  In addition, Torrey requested $26,276.12 in prejudgment interest on the lost profit and other compensatory and consequential damages, calculated from the date on which this action was filed to April 1.  Following oral argument, Torrey amended his calculation to reflect the reduction in liquidated damages to account for the value of the collection.  Plaintiff now requests prejudgment interest in the amount of $50,944.41. The Court awards this amount in full.

The question of prejudgment interest is considered one of substantive law, and therefore, state law applies in federal diversity actions.  *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999). California law on prejudgment interest is governed by § 3287 of the California Civil Code, which provides as follows:

§ 3287. Interest on damages; right to recover; time from which interest runs

(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any such debtor, including the state or any county, city, city and county, municipal corporation, public district, public agency, or any political subdivision of the state.

9

**United States District Court**

For the Northern District of California

1
2
3

(b) Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed.

4   Cal. Civ. Code § 3287.  "Damages are liquidated for the purposes of awarding interest if they are certain

5   from computation from the face of the contract, or if they might be made certain by reference to

6   well-established market values plus computation." 23 Cal. Jur. 3d Damages § 99. "A claim which

7   requires determination by judicial process is deemed to be unliquidated, because the amount cannot be

8   ascertained until the court has clarified the element of uncertainty in the contract breached." *Id.*, § 100.

9         Because the $150,000.00 purchase price less the $19,045.00 appraised value of the collection

10  (that is, $130,955.00) constitutes liquidated damages, Torrey is entitled to interest on that amount from the

11  date of payment, May 11, 2004, pursuant to Cal. Civ. Code § 3287(a).  The remaining compensatory and

12  consequential damages are unliquidated and therefore, it is in the Court's discretion to award prejudgment

13  interest pursuant to Cal. Civ. Code § 3287(b). "Generally, interest is not allowed upon unliquidated

14  damages. . . . But when necessary in order to arrive at fair compensation, the court in the exercise of a

15  sound discretion may include interest or its equivalent as an element of damages." *Miller v. Robertson*,

16  266 U.S. 243, 258 (1924).

17        Here, Westrich promised Torrey that resale would easily accomplished, that he would assist in the

18  resale, and that the collection would bring in at least $350,000.00 in profits.  By the time this action was

19  filed, it was clearly ascertainable the collection was virtually worthless and that the $350,000 in profits

20  would never materialize. Under these circumstances, the Court concludes that an award of prejudgment

21  interest on the remaining $350,000 is required to fully compensate Torrey.  Therefore, the Court awards a

22  total of $50,944.41 in prejudgment interest.[4]

23
24
25

26      [4]This amount is calculated using the California pre-judgment interest rate of 10% per annum, from May

27  11, 2004 to June 2, 2005 (the date on which Plaintiffs submitted their amended interest calculation).

28

**United States District Court**
For the Northern District of California

### 2.    Punitive Damages

Torrey requests an award of punitive damages in the amount of $507,865.00.  California Civil Code § 3294 allows an award of punitive damages where there is "clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  The question of whether punitive damages should be awarded lies within the discretion of the finder of fact because the degree of punishment depends on the peculiar circumstances of each case.  *Hannon Engineering, Inc. v. Reim*, 126 Cal. App.3d 415, 431 (1981).  A plaintiff is never entitled as a matter of right to punitive damages. *Id*.  The purpose of punitive damages is to punish wrong-doers and thereby deter the commission of wrongful acts.  *Neal v. Farmers Ins. Exchange*, 21 Cal. 3d 910, 928 n. 13 (1978).  In considering whether to award punitive damages, the court considers the degree of reprehensibility of the defendant's acts, the amount of compensatory damages relative to the harm suffered and the wealth of the defendant.  *Id*.

In this case, there is clear and convincing evidence that Westrich committed fraud not only in selling the collection to Torrey but also in his repeated and calculated lies following purchase.  Torrey even lied to the Antioch police, apparently to avoid arrest.  In addition, there is evidence that Plaintiff has committed this type of fraud before.  *See* Presky Decl., ¶ 7 (stating that Westrich was sued in Tennessee for fraud associated with a sale of artifacts and that default judgment was entered against him in that case in the amount of $111,713.80).  Finally, at oral argument, Torrey and Osburn stated their belief that Westrich continues to sell artifacts at art shows, raising the possibility of future fraud.  Under these circumstances, the Court concludes that an award of punitive damages is appropriate.  The Court awards $480,955.00 in punitive damages

### 3.    Costs

In the Motion, Torrey sought $1,196.90 in costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure on the basis that he is the prevailing party in the action.  Presky Decl. at 3.  In a supplemental brief, Plaintiff reduced this amount to $1,046.00.  *See* Submission of Court Reporter's Invoice in Connection with Plaintiff's Motion for Entry of Default Judgment (reflecting $150.00 in court

reporter fees rather than the $300.00 originally requested).  All of the identified costs are allowable under Civil Local Rule 54-3 except the $202.40 in travel expenses incurred by Torrey's counsel in attending the Gutierrez deposition, which are expressly disallowed under Rule 54-3(c)(2).  Therefore, the Court awards $844.50 in costs.

**IV.     CONCLUSION**

For the reasons stated above, default judgment is entered against Defendant and damages and costs are awarded in the amount of $1,021,613.91 (that is, $488,820.00 in compensatory and consequential damages, $50,994.41 in prejudgment interest, $480,955.00 in punitive damages, and $844.50 in costs).


IT IS SO ORDERED.


Dated:_____

_____
JOSEPH C. SPERO
United States Magistrate Judge

**United States District Court**
For the Northern District of California

12